THE MORRIS & CUMMINGS DREDGING COMPANY, PROSE-
CUTOR, v. JERSEY CITY AND THE GREENVILLE AND
HUDSON RAILWAY COMPANY.

Argued February 21, 1899—Decided November 13, 1899.

1. By the act of 1874, entitled "An act to authorize any city of this state
to enter into contracts with railroad companies whose roads enter their
corporate limits, whereby said companies may relocate, change or ele-
vate their railroads, and when necessary for that purpose, to vacate,
change the grade of or alter the lines of any streets or highways
therein," it was enacted that the proper municipal authorities of any
city should be authorized and empowered to enter into such contracts
with any railroads whose roads enter their cities, respectively, &c.
*Held*, that this act, by its title and in the body of the act, was re-
stricted to contracts with railroads whose roads enter their corporate
limits.

2. By the act of 1893 the first section of the act of 1874 was amended,
the title being retained. The body of that act enlarged the powers
conferred by the act of 1874 and authorized municipal authorities to
enter into such contracts with any railroad company whose road may
enter or lie within their cities. *Held*—

1. That the enacting clause of the latter act must be restricted to the
object expressed in its title, and the words in the body of the act,
which purpose to enlarge the powers of these municipal bodies beyond
the purpose expressed in the title, must be rejected.

2. Neither the act of 1874 nor the act of 1893 empowered the munici-
pal authorities of a city to make such a contract with a company hav-
ing its termini entirely within the city.

On *certiorari.*

Before Justices DEPUE, VAN SYCKEL and GUMMERE.

For the prosecutor, *Charles D. Thompson* and *Richard V.
Lindabury.*

For the defendants, *Corbin & Corbin, John W. Queen* and
*William D. Edwards.*

The opinion of the court was delivered by

DEPUE, J.    This writ brings up the proceedings of the
board of street and water commissioners of Jersey City in

relation to Chapel avenue, a public street in Jersey City. This avenue was dedicated fifty feet in width and extended from Garfield avenue easterly, to the shore of the New York bay. A grade was adopted for the avenue some years ago, but it has never been worked to grade. Though it has been used, it has not been used to its full width.

The proceedings brought up by this writ consist of a resolution of the board of street and water commissioners. This resolution was initiated by a petition by the railroad company, asking that the grade of the avenue from the Central railroad to the Morris canal be changed, in order that the company might construct its tracks across said avenue and avoid a grade crossing. The petition of the company was that the grade of Chapel avenue, from the northwesterly line of the property of the Morris Canal and Banking Company, be changed by elevating the same, so that the tracks of the company's railway could be constructed underneath the avenue, with a perpendicular clearance of eighteen feet. The petitioners offered to the city as a contract for acceptance as follows: That the company would dedicate to public use as part of Chapel avenue a tract of land described. Upon the tract so dedicated the company would agree to locate, construct and grade a carriageway twenty-five feet in width, constructed on a solid embankment, as shown on an accompanying map, and to construct and maintain an iron or steel viaduct over all their right of way and tracks between the line of the Central railroad and the tract so dedicated; such viaduct to be of the same width and in the continuation of the viaduct now existing across the tracks of the Central railroad of New Jersey at this point. The petition further set out that in accepting its offer the city should agree on its part: (1) That the established grade of Chapel avenue should be changed as requested; (2) that the tract of land offered for dedication should constitute a part of Chapel avenue; (3) that the company might enter upon Chapel avenue and make said improvements, with the new grade above described, and excavate and construct their tracks underneath said viaduct as

above proposed. The resolution in question, after reciting the propositions of the railway company, accepted the same as proposed and declared that this resolution, in conjunction with the petition of the railway company, should constitute a contract between the city and the said company, in pursuance of the act of 1893. *Gen. Stat., p.* 2689.

This resolution wrought the following changes in the avenue:

*First.* A change of grade as follows: "Starting at the northwesterly line of the right of way of the Central railroad, at the present elevation of forty and six-tenths of the top of floor, at the northwesterly end of the present Chapel avenue bridge over said railroad; thence rising for a distance of one hundred and two feet to elevation forty-two at the southeasterly right-of-way line of said railroad; thence falling for a distance of one hundred and seventy feet to elevation forty-one and thirty-four hundredths; thence falling for a distance of one hundred and thirteen feet to elevation thirty-five and one hundred and twenty-five thousandths; thence falling for a distance of twenty-five feet to elevation thirty-four and eight-tenths; thence falling for a distance of one hundred feet to elevation twenty-nine and eight-tenths; thence falling for a distance of forty-five feet to elevation twenty-eight and nine-tenths; thence falling for a distance of one hundred feet to elevation twenty-three and nine-tenths; thence falling for a distance of thirty feet to elevation twenty-three at the top of floor at the northwesterly end of the present bridge over the Morris canal."

*Second.* The location of the avenue was changed, so that instead of passing in straight lines over the place of crossing, as it was before, with the distance of seventy-five feet, it was deflected entirely from the original lines of the avenue, and in the place of the old avenue there was substituted a loop, extending at right angles to the avenue about one hundred and fifty feet, with a maximum grade of twelve and one-half feet, with a return to the original line of the avenue, making in all three hundred and two feet; the width of the roadway

on the loop being twenty-five feet. In addition, the plan proposed included a viaduct two hundred feet in length, extending from the northwesterly end of the loop in the line of Chapel avenue to the southeasterly side of the Central railroad ; the width of the viaduct in the clear being seventeen feet. Between the two parts of this loop there is an embankment of solid filling, around the point of which the avenue is carried, with curves ranging from ten to twenty feet, the curve at the point of the loop being only fifteen feet. Mr. Grant, an engineer, described it as " practically a spiral turning through a semi-circle."

The changes proposed consist in the alteration of the location of the avenue at that point, and the narrowing of the width of the avenue from the width of fifty feet to twenty-five feet.

The official action of the board is sought to be justified in virtue of the act of 1893, which authorizes cities to enter into contracts with certain railroad companies to provide for other than grade crossings of streets or highways. The first legislation to this effect was the act of March 19th, 1874. That act is entitled "An act to authorize any city of this state to enter into contracts with railroad companies whose roads enter their corporate limits, whereby said companies may relocate, change or elevate their railroads, and when necessary for that purpose, to vacate, change the grade of or alter the lines of any streets or highways therein." It provided in its first section " that the proper municipal authorities respectively of any city of this state be and they are hereby authorized and empowered to enter into such contracts with any of the railroad companies whose roads enter their cities respectively, to secure greater safety to persons and property therein, whereby the said railroad companies may relocate, change or elevate their railroads within said cities, or either of them, as in the judgment of such municipal authorities respectively may be best adapted to secure the safety of lives and property and promote the interests of said cities respectively, and for that purpose shall have power to vacate, alter the lines

and change the grades of any streets or highways therein, and to do all such acts as may be necessary and proper to effectually carry out such contracts." *Pamph. L.* 1874, *p.* 45. This act by its title and in the body of the act was restricted to contracts with "railroads whose roads enter their corporate limits." The condition of things at the time this act was passed is well known. There was at that time no such thing as a railroad incorporated or constructed within limits which were wholly within one municipality. Railroads incorporated and constructed wholly within the corporate limits of one city were brought into existence under the General Railroad law. The Greenville and Hudson Railway Company was incorporated under the General Railroad law, and its termini are within Jersey City. It is, therefore, not such a railroad company as by the act of 1874 the municipal authorities of Jersey City had power to make such a contract with as is now in question.

By the act of 1893 the first section of the act of 1874 was amended. The powers conferred by the later act are enlarged beyond the powers conferred by the act of 1874. In the body of the act, for the words "any of the railroad companies whose roads enter their cities," contained in the act of 1874, were substituted the words "any of the railroad companies whose roads now or hereafter may enter or lie within their cities respectively, or whose routes have been or may be located therein." *Pamph. L.* 1893, *p.* 157. But the infirmity in this act to sustain this official action of the municipal authorities consists in the fact that the capacity of the city to contract with this railway company, conferred by the change in the language of the act of 1874, is inefficacious, for the reason that it is not within the title of the act. The title of the act of 1874 expressly restricted the power of cities in the premises to contracts with certain railroad companies; that is, those whose roads enter their corporate limits. The act of 1893 is a supplement to the act of 1874, describing the latter act by its title in full. By force of this description in the title of the act the enacting clause must be restricted to the

object expressed in the title, and the words substituted in the body of the act, which purport to enlarge the powers of these municipal bodies beyond the purpose expressed in the title, must be rejected. *Rader* v. *Township of Union,* 10 *Vroom* 509; *Evernham* v. *Hulit,* 16 *Id.·* 53; *Hendrickson* v. *Fries, Id.* 555, 563; *Dobbins* v. *Northampton,* 21 *Id.* 496; *Schenck* v. *State,* 31 *Id.* 381; *Kreigh* v. *Freeholders of Hudson,* 33 *Id.* 178. In *United New Jersey Railroad Co.* v. *National Docks, &c., Co.,* 28 *Vroom* 523, the act of 1893 was put in force without any allusion to the validity of that act. The counsel in this case, who were counsel in that case, inform the court that the question was not discussed, and no allusion is made in the opinion of the court to a departure in the body of the act from its title. Nor does it anywhere appear in the report of the case that the National Docks Company, which had obtained a contract under the act of 1893 with the city, was a corporation confined within the limits of Jersey City.

Being of opinion that neither the act of 1874 nor the act of 1893 empowered the municipal authorities of Jersey City to make such a contract with this company, the proceedings are found to be illegal, without considering the other reasons for reversal which were argued.

It was contended by the defendants that the prosecutor had not such an interest in this street and the alterations made in it as would give it a standing in court to prosecute a writ of *certiorari.* It is not an abutting owner on the street at the places where these changes were contemplated. The land required for that purpose was owned by the defendants, and was donated to the city for use in making these changes. But the tract of land owned by the prosecutor consists of about fourteen and a half acres of upland, with riparian rights to a shore front of about twenty-five hundred feet, for which it has a lease from the state for the land under water in front of its property, which includes within its lines the grant of two hundred and two acres, on which it has paid the state for rentals $75,000. Chapel avenue strikes about the middle of this tract. It is the only street to the shore

front between Communipaw avenue and the city line, a distance of over three miles. The prosecutor has no other means of access to this property from Jersey City, and the facts disclosed in the case show that the situation of the surrounding property is such that a new means of access to Jersey City from its property, if not impracticable, would be attended with large expense. The interference with the use of this street by the execution of the plan proposed by this resolution is very great. That the prosecutor will sustain an injury directly to its property, seriously affecting its use, as well as its market value, is apparent, and it is not such an injury as the prosecutor suffers in common with the public. In that respect it has a personal and property interest, specially and immediately affected by the action complained of, such as will justify a writ of *certiorari*. *Jersey City* v. *Traphagen*, 24 *Vroom* 434, 436 ; *Tallon* v. *Hoboken*, 31 *Id.* 212, 214.

The resolution and proceedings under it should be set aside.